UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------x

RAUL GLASGOW and PATRINA CARTER,

**AMENDED COMPLAINT**

                    Plaintiffs,          **14-CV-6243**

**Jury Trial Demanded**

              -against-

THE CITY OF NEW YORK; NYPD PO BONANNO, JOHN,
Shield 6211; NYPD SGT RICH, GARY, Shield 5064;
NYPD PO FRAGEDIS, Shield Unknown;
NYPD PO KARABIN, STEPHEN, Tax No 940323;
individually and in their official
capacities as New York City Police Officers,

                  Defendants.
----------------------------------------------x

**NATURE OF THE ACTION**

1. This is an action to recover money damages arising out of the
violation of plaintiffs' rights under the Constitutions of the
United States and the State of New York.


**JURISDICTION AND VENUE**

2. This action is brought pursuant to 42 U.S.C. § 1983, § 1986
and § 1988, the First (1st), Fourth (4th), Fifth (5th) and
Fourteenth (14th) Amendments to the Constitution of the United
States; and the laws of the State of New York.

3. The jurisdiction of this Court is predicated upon 28 U.S.C. §
1331 (Federal Question), § 1343 (Civil Rights) and § 1367(a)
(Supplemental Jurisdiction).

4. Venue is proper in this district, pursuant to 28 U.S.C. §
1391 (b) and (c), on the basis of Plaintiffs' residence and the
location of the acts and omissions giving rise to the claim.


**JURY DEMAND**

5. Plaintiffs demand a trial by jury in this action.


**PARTIES**

6. Plaintiffs RAUL GLASGOW and PATRINA CARTER
("Plaintiff" or "Plaintiffs" or "Mr. GLASGOW" and/or "Mrs.
CARTER") are residents of Kings County in the City and State of
New York.

7. Defendant, City of New York ("NYC" or "The City"), is a
municipal corporation organized under the laws of the State of
New York. It operates the New York Police Department ("NYPD"), a
department or agency of The City, responsible for the
appointment, training, supervision, promotion and discipline of
police officers and supervisory police officers, including the
individually named police officer defendants herein.

8. Defendants, NYPD PO JOHN BONANNO, Shield NO. 6211; NYPD SGT
GARY RICH, SHIELD NO. 5064; NYPD PO FRAGEDIS, Shield NO.

unknown, and NYPD PO STEPHEN KARABIN, Tax No. 940323, at all times relevant herein, were/are officers, servants, employees and agents of the NYPD, and assigned to the 67th precinct. Defendants, BONANNO, RICH, FRAGEDIS, and KARABIN are sued in their individual and official capacities.

9. At all times relevant herein, all individual defendants were acting under color of state law.

**STATEMENT OF FACTS**

10. At approximately 10:30 p.m. on November 14th, 2012, Plaintiff, Mr. Raul Glasgow, was travelling northbound in his vehicle, a 1997 Pontiac Firebird, in the vicinity of Utica Avenue and Clarkson Avenue, Brooklyn, NY. Mr. Glasgow had just dropped off a friend at her home after taking her to the grocery.

11. At the time the vehicle displayed temporary plates from the State of Maryland.

12. There was reduced visibility because it was after 10:30 at night, despite the street lighting.

13. Defendants, NYPD PO Bonanno and NYPD PO Fragedis, operating an unmarked police vehicle, initiated a traffic stop and questioned Mr. Glasgow about the temporary plates on his car.

14. The officers were some distance behind Mr. Glasgow's vehicle prior to initiating the stop, and the temporary plates looked like any other temporary plate.

15. After Mr. Glasgow provided a valid New York State non-driver's ID - his driver's license had been suspended - he was removed from the vehicle, searched, and then the entire vehicle searched without a warrant.

16. After an extensive search of both Mr. Glasgow's person and his vehicle Defendant officers were unable to find any weapons, drugs, or any other illegal items for that matter.

17. Mr. Glasgow was placed back in his vehicle, and the two Defendant officers then conferred with the two (2) other Defendant officers, NYPD SGT Rich and NYPD PO Karabin, who had joined them by this time in another unmarked police car.

18. The Defendant officers then decided to place Mr. Glasgow under arrest, took him to the 67th Precinct, searched him again, then fingerprinted and photographed him.

19. The only items recovered from his person during this second search were his keys, his phone and cash.

20. Defendant officers then engaged in a line of questioning and threats that sought to elicit information about guns and drugs, promising to return Mr. Glasgow's car rather than impound it if he was able to provide information on guns or drugs.

21. They gave him the impression that he could report a gun or gun dealer without any questions or consequences to himself. He was inclined to believe them because there was a poster in the precinct at the time to that effect.

22. After considering the possible costs involved in retrieving his vehicle if impounded, Mr. Glasgow decided to provide information about a gun that belonged to a mechanic named Andre Carrasco who had committed suicide on January 25th, 2012.

23. The recovered weapon was stored in a common area under the outside stoop near Mr. Glasgow's apartment at 284 Cornelia Street, Brooklyn, NY 11221, outside the jurisdiction of the 67th Precinct, in a multiple dwelling, in a cache of tools owned by Mr. Carrasco.

24. After giving Mr. Glasgow his own cellphone at approximately 12:29 AM to call his wife, Mrs. Patrina Carter, one of the Defendant officers spoke to Mrs. Carter, instructing her to follow all of Mr. Glasgow's instructions.

25. Mrs. Carter was then instructed to retrieve the weapon from its location under the stoop, wipe it clean – most likely to erase any evidence of Andre Carrasco's past possession and ownership of the weapon - and give it to the officers when they arrived.

26. Calls from Mr. Glasgow's phone to his wife's phone were also made at 12:40 AM, 12:58 AM, 12:59 AM and 01:00 AM, more than two (2) hours after his arrest and processing at the 67th precinct.

27. When the four (4) Defendant officers arrived at the location at approximately 01:00 AM they referred to Mrs. Carter by name and asked if she was married to Mr. Glasgow. She then indicated the location of the weapon under the stoop, and an officer retrieved it from the location indicated.

28. The officer then asked Mrs. Carter whether the weapon had been wiped. Mrs. Carter responded in the affirmative, and the officer responded, "Okay."

29. The officers then proceeded to question Mrs. Carter about her relationship with Mr. Glasgow, including whether they were legally married, had any marital issues, and other such personal questions. They eventually left after approximately ten (10) minutes.

30. Later that morning the officers took Mr. Glasgow's cell phone from him, demanded his PIN code, and erased the calls from his phone log in an attempt to conceal their activity.

31. Additionally, the defendant officers never recorded or reported any of the true facts related to the manner and place in which the weapon was actually recovered as required by law, and incorporated in standard police procedure.

32. Mr. Glasgow was subsequently transported from the police precinct to central booking, only to learn later at his court appearance, to his utter shock, dismay and total disbelief, that he was being charged with criminal possession of a weapon in the 2nd, 3rd and 4th degree, criminal possession of a forged instrument in the 3rd degree, aggravated unlicensed operation of a motor vehicle in the 3rd degree, and operating a motor vehicle without being duly insured. Mr. Glasgow's car was also impounded.

33. Rather than log the weapon as one voluntarily turned in by a citizen, the officers chose to charge Mr. Glasgow with criminal possession of the loaded firearm so that they would be credited with an arrest emanating from a serious offence.

34. Arrests by officers for serious offences weigh heavily in the New York Police Department in assessing candidates for promotion to detective, unlike promotion to Sergeant, which requires the passing of a written exam.

35. NYPD PO Bonanno, shield no. 6211, perjured himself when, in his sworn criminal complaint, he stated that the weapon was recovered from the trunk of Mr. Glasgow's car, buried beneath computer parts, in a search conducted at the precinct.

36. Mr. Glasgow was held for the next twenty (20) days until he was finally able to post bail on December 3rd, 2012.

37. Sometime between the night of Mr. Glasgow's arrest and March 26th, 2013, PO Bonanno appeared before a Grand Jury, under oath, and again perjured himself, giving false testimony about finding the gun in the trunk of Mr. Glasgow's car, buried beneath computer parts. This resulted in the Grand Jury returning a true bill, and consequently, Mr. Glasgow's indictment on the aforementioned charges.

38. On March 27th, 2013, Mr. Glasgow was again taken into custody, and his bail set at $15,000.00, after he was held for allegedly walking between subway cars. He was never charged or cited for walking between the subway cars. However, he was held in jail on the previous charges emanating from his 11.14.12 arrest.

39. He was held until August 1st, 2013, at which time the District Attorney's office moved to dismiss all charges, citing information that seriously questioned the veracity of Officer Bonanno's sworn statements.

40. The arrest and prosecution was deemed a nullity, and Mr. Glasgow's status was restored to the position he occupied prior to the arrest and prosecution. His car was also returned to him.

41. At no time between the time of Mr. Glasgow's initial arrest on November 14th, 2012 and his eventual release on August 1st, 2013 did any of the four (4) officers involved - all of whom had actual knowledge of the true circumstances under which the

weapon was retrieved - intercede or intervene to correct the record and prevent the violations of Mr. Glasgow's rights.

42. During the entire time of his confinement Mr. Glasgow feared for his life, as fights were a commonplace event, putting all within the restrictive confines of the jail in danger of harm or death. Very little or no provocation was required for one to erupt at a moments notice.

43. The ongoing unprovoked altercations were a source of constant distress for Mr. Glasgow, causing sleep loss while incarcerated for fear of attacks in his sleep. In addition, since his release, Mr. Glasgow continues to have an unhealthy fear of public spaces, and remains extremely fearful of the slightest encounter with any law enforcement personnel.

44. During all of Mr. Glasgow's time incarcerated his wife visited him regularly, and was forced to sit helplessly and in shock as fights broke out in close proximity to them on more than one occasion.

45. Each time she feared Mr. Glasgow would be the next recipient of the brutal attacks, and once visitation was over her life was constantly filled with the fear of him being killed while he was locked up.

46. Moreover, after receiving assurances from Mr. Glasgow that he had made a deal with the officers, and having complied with the instructions, she was shocked, devastated, and dismayed to

learn of the charges and allegations being made, especially in light of what she knew to be the truth.

47. As a result, Mrs. Carter spent many nights stressed out, unable to sleep, eat or function as she normally did. Without any source of income, she could not afford to seek specialized medical help, and was forced to suffer in silence.

48. Mr. Glasgow was on track to graduate from Hunter College, CUNY, in the Spring of 2013. Because of his unlawful arrest and false imprisonment Mr. Glasgow was unable to complete his final classes, lost his tuition, and was unable to graduate in the Spring of 2013 as originally scheduled, adding further to his mental and emotional distress.

49. In addition, as a result of Mr. Glasgow's lengthy and unlawful imprisonment, his family incurred extensive credit card debt; and his business, Short Circuited, lost clients, revenue, and suffered damage to its reputation.

50. Mr. Glasgow suffered damage as a result of Defendants' actions. Plaintiff was deprived of his liberty, suffered extreme emotional distress, mental anguish, shock, fear, anxiety, embarrassment, humiliation, and damage to his reputation.

51. Mrs. Carter also suffered damage as a result of Defendants' actions. She was deprived of her right to consortium, suffered extreme emotional distress, mental anguish, shock, fear and anxiety.

52. Defendants were served a Notice of Claim on October 28th, 2013, in satisfaction of New York General Municipal Law § 50-e, and more than thirty (30) days have elapsed since the service of said notice. To date the claim for adjustment and payment has been ignored, neglected or refused by Defendants. This action was commenced within one (1) year and ninety (90) days of the occurrence of the events that gave rise to these claims.

**FIRST CLAIM**

***42 U.S.C. § 1983 and Article 1, §§ 12 of the New York State Constitution - Unlawful Stop and Search***

53. Plaintiffs repeat and re-allege each and every allegation made from paragraph 1 to 52 as if fully set forth herein.

54. Defendants violated the Fourth and Fourteenth Amendments of the U.S. Constitution, as well as Article 1, §§ 12 of the New York State Constitution, because they stopped and searched the plaintiff without probable cause or a reasonable suspicion that a crime had been committed or was in the process of being committed. The temporary license plates looked like any other temporary plate, and given the time of night, reduced visibility, and distance from Plaintiff's car, defendants would be unable to tell if the plates were valid or not, or more importantly, whether they had been tampered with.

55. As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages herein before alleged.


**SECOND CLAIM**

*42 U.S.C. § 1983 and Article 1, §§ 12 of the New York State Constitution - False Arrest*

56. Plaintiffs repeat and re-allege each and every allegation made from paragraph 1 to 55 as if fully set forth herein.

57. Defendants violated the Fourth (4th) and Fourteenth (14th) Amendments of the U.S. Constitution, as well as Article 1, §§ 12 of the New York Constitution because they arrested plaintiff without probable cause, having made an unlawful stop and search, and unlawfully obtained evidence.

58. As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages herein before alleged.


**THIRD CLAIM**

*42 U.S.C. § 1983 and Article 1, §§ 12 of the New York State Constitution - False Imprisonment*

59. Plaintiffs repeat and re-allege each and every allegation made from paragraph 1 to 58 as if fully set forth herein.

60. Defendants violated the Fourth (4th) and Fourteenth (14th) Amendments of the U.S. Constitution, as well as Article I, §§ 12 of the New York Constitution, because they imprisoned plaintiff

without probable cause, having created false evidence against
plaintiff.

61. As a direct and proximate result of this unlawful conduct,
Plaintiff sustained the damages herein before alleged.

**FOURTH CLAIM**

*42 U.S.C. § 1983 and Article 1, §§ 12 of the New York State
Constitution - Denial Of Constitutional Right To Fair Trial*

62. Plaintiffs repeat and re-allege each and every allegation
made from paragraph 1 to 61 as if fully set forth herein.

63. The individual defendants created false evidence against
Plaintiff, and in violation of Plaintiff's First (1st) and Fourth
(4th) Amendment right to have access to and seek redress in
court, the Defendants acted to conceal and cover up their
unlawful activity.

64. Further, Defendants BONANNO, RICH, FRAGEDIS and the KARABIN
Defendant forwarded false evidence, likely to influence a jury's
decision, to prosecutors in the Kings County District Attorney's
office, resulting in the deprivation of Mr. Glasgow's liberty.

65. In creating false evidence against Plaintiff, and in
forwarding false information to prosecutors, the individual
defendants violated Plaintiff's constitutional right to a fair
trial under the Due Process Clause of the Fifth (5th) and

Fourteenth (14th) Amendments of the United States Constitution, as well as Article 1, §§ 12 of the New York Constitution.

66. As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein before alleged.

**FIFTH CLAIM**

*42 U.S.C. § 1983 and Article 1, §§ 12 of the New York State Constitution - Malicious Prosecution*

67. Plaintiffs repeat and re-allege each and every allegation made from paragraph 1 to 66 as if fully set forth herein.

68. The individual defendants commenced criminal proceedings against the Plaintiff without probable cause to believe the criminal proceeding could succeed because they falsified evidence against the Plaintiff, in violation of the Fourth (4th) Amendment, to effectuate the arrest, and falsely testified against the Plaintiff before the Grand Jury.

69. The prosecution was commenced with malice because individual Defendants did not intend to see the ends of justice served, but rather, intended to enhance their opportunity for promotion to detective within the NYPD. Moreover, their falsification of evidence egregiously deviated from proper investigative procedures.

70. In maliciously prosecuting Plaintiff, the individual Defendants violated Plaintiff's rights under the Fourth (4th),

Fifth (5th) and Fourteenth (14th) Amendments of the U.S. Constitution, as well as Article I, §§ 12 of the New York State Constitution.

71. As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein before alleged.

**SIXTH CLAIM**

***42 U.S.C. § 1983 - Malicious Abuse Of Process***

72. Plaintiffs repeat and re-allege each and every allegation made from paragraph 1 to 71 as if fully set forth herein.

73. The individual defendants issued legal process to place Plaintiff under arrest.

74. The individual defendants arrested Plaintiffs in order to obtain collateral objectives outside the legitimate ends of the legal process, in particular, to meet quotas and/or enhance their chances for promotion to detective within the ranks of the NYPD.

75. The individual defendants acted with intent to do harm to Plaintiff without excuse or justification, having falsified evidence against Mr. Glasgow, and took steps to conceal their activity. Here again, falsification of evidence egregiously deviated from proper investigative procedures.

76. As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein before alleged.

**SEVENTH CLAIM**

*42 U.S.C. § 1986 - Failure To Intervene/Intercede*

77. Plaintiffs repeat and re-allege each and every allegation made from paragraph 1 to 76 as if fully set forth herein.

78. Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct, and failed to intervene.

79. Accordingly, the defendants who failed to intervene violated the First (1st), Fourth (4th), Fifth (5th) And Fourteenth (14th) Amendments.

80. As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein before alleged.


**EIGHTH CLAIM**

*42 U.S.C. § 1983 and New York State Law - Intentional Infliction Of Emotional Distress*

81. Plaintiffs repeat and re-allege each and every allegation made from paragraph 1 to 80 as if fully set forth herein.

82. Defendants' actions, to wit, intentionally falsifying evidence against Mr. Glasgow in order to unconstitutionally deprive him of his freedom, were extreme and outrageous, and caused him severe emotional distress in the form of loss of

sleep, nervousness and constant ongoing fear of public spaces and law enforcement personnel.

83. Further, Defendants' actions were, at the very least, reckless and with utter disregard of the consequences.

84. Additionally, Defendants' actions also caused severe emotional distress to Mrs. Carter.

85. As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein before alleged.

**NINTH CLAIM**

*42 U.S.C. § 1983 and New York State Law - Negligent Infliction Of Emotional Distress*

86. Plaintiffs repeat and re-allege each and every allegation made from paragraph 1 to 85 as if fully set forth herein.

87. Defendants' intentional falsification of evidence against Mr. Glasgow resulted in his false imprisonment with dangerous and violent offenders, putting him in constant fear of harm and for his life.

88. As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages herein before alleged.

**TENTH CLAIM**

*42 U.S.C. § 1983 and New York State Law - Loss of Consortium*

89. Plaintiffs repeat and re-allege each and every allegation made from paragraph 1 to 88 as if fully set forth herein.

90. At all times relevant to this action, Patrina Carter was and continues to be the lawful wife of the Plaintiff, Raul Glasgow, and as such was and continues to be entitled to the comfort, enjoyment, society, and services of her husband as guaranteed by the laws and constitution of the State of New York.

91. Defendants' intentional falsification of evidence against Mr. Glasgow resulted in his false imprisonment, and consequently deprived Mrs. Carter of the comfort, enjoyment, society, and services of Mr. Glasgow.

92. As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein before alleged.


**ELEVENTH CLAIM**

**_42 U.S.C. § 1983 and New York State law – Respondeat Superior Claim Against The City Of New York_**

93. Plaintiffs repeat and re-allege each and every allegation made from paragraph 1 to 92 as if fully set forth herein.

94. Defendant NYC historically has consistently underreacted to complaints against police officers for acts of abuse, brutality, and providing false testimony, and has demonstrated deliberate indifference to the violation of the civil rights of citizens, and in particular, Mr. Glasgow.

95. According to the New York Civil Liberties Union, between 2002 and 2014, in a city with an estimated population of 8,405,837, there were 5,108,923 stop-and-frisks conducted by officers of the NYPD.

96. Blacks and Latinos accounted for over eighty percent (80%) of those stops. Over 87% of those stopped – 4.5 million plus – were completely innocent.

97. Even after Judge Shira A. Scheindlin ruled on August 12th, 2013, that the stop-and-frisk policy violated the Fourth (4th) and Fourteenth (14th) Amendment rights of citizens, and that there was deliberate indifference to equal protection violations, the City, through its highest ranking public official, Mayor Bloomberg, vowed to fight the ruling.

98. This longstanding policy, practice and custom of the City, coupled with the reluctance to investigate complaints and/or discipline officers, facilitated the action of the defendant officers, emboldening them to violate rights of citizens in various ways in order to obtain arrests and enhance their own opportunities for promotion.

99. In Particular, defendant officers stop of Mr. Glasgow was consistent with the policy of stop-and-frisk, disregarding his right to move freely unless there was probable cause to stop him.

100. Acts of police brutality, excessive force, and general discourteous behavior, among other things, have resulted in 88,312 allegations against police officers since 2009, according to the Civilian Complaints Review Board ("CCRB"). The 2013 CCRB report identified the 67th Precinct, defendant officers' home station, as one of the sources of the second highest number of complaints.

101. Falsifying evidence or making false statements are referred back to the Police Internal Affairs Bureau ("IAB") by the CCRB. There were 13 such referrals in 2013. However, because the CCRB is not the only agency to which police misconduct is reported, that number is not wholly indicative of the prevalence of these incidents/reports. Many reports are made directly to the precincts and IAB, pointing to a higher prevalence of these incidents/reports than the CCRB statistics alone would indicate.

102. The City has actual and/or constructive knowledge of the practice of violating citizens' rights from the overwhelming number of complaints lodged with the CCRB, precincts and IAB, and its own endorsement of the use of stop-and-frisk despite successful legal challenges to its use.

103. As a direct and proximate result of this longstanding policy, practice and custom of the City, and Defendant officers' violation of Plaintiff's rights while in the performance of

their duties, Plaintiff sustained the damages herein before alleged.


**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectfully request judgment against defendants as follows:


(a) Compensatory damages against all defendants, jointly and severally in an amount to be determined at trial;

(b) Punitive damages against the individual defendants, jointly and severally in an amount to be determined at trial;

(c) Reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1988; and

(d) Such other and further relief as this Court deems just and proper.


DATED: November 4, 2015
Brooklyn, New York


_____
Stanice John, Esq.
THE LAW OFFICE OF STANICE JOHN, P.C.
1086 Broadway, Studio #7
Brooklyn, New York 11221
(347) 725-0887
sjesq@stanicejohnesq.com
Attorney for plaintiffs
sjesq@stanicejohnesq.com
Attorney for plaintiffs